IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WENDELL JONES, | ) |
| | ) |
| Petitioner, | )   Civil Action No. 2:20-cv-1631 |
| | ) |
| v. | ) |
| | )   Magistrate Judge Patricia L. Dodge |
| MINDY ADAMS, *et al.*, | ) |
| | ) |
| Respondents. | ) |

**MEMORANDUM**

Pending before the Court[1] is the Petition for a Writ of Habeas Corpus (ECF 1) filed by state prisoner Wendell Jones under 28 U.S.C. § 2254. Jones challenges the judgment of sentence imposed on him by the Court of Common Pleas of Allegheny County in October 2011 at criminal docket number CP-02-CR-8512-2010. For the reasons below, the Court will deny the Petition with prejudice because each of Jones' claims for habeas relief are time-barred and will deny a certificate of appealability.

**I.    Relevant Background**[2]

Following a jury trial, Jones was found guilty of the crimes of first degree murder for the death of Sonsiarae Watts, first degree murder for the death of Dahl Palm, burglary, and carrying a firearm without a license. Attorney R. Blain Jones, II ("trial counsel") represented Jones.

The state court summarized the evidence introduced at Jones' trial as follows:

> The victims in this case were Sonsiarae Watts and Dahl Palm, who were dating each other at the time they were murdered on July 4, 2008. Ms. Watts and Mr. Palm were found dead on the floor of the master bedroom of Ms. Watt[s']

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including entry of a final judgment.
[2] Respondents attached as exhibits to their Answer (ECF 17) the relevant state court filings and decisions.

1

apartment located at 1096 Valley Street. Michael Panella, a forensic pathologist with the Allegheny County Medical Examiner's Office, testified that Ms. Watts suffered two gunshot wounds to her left breast and another gunshot wound to her sternum. The bullet which penetrated her sternum severed her aorta. Mr. Panella testified that this gunshot killed her within minutes. She also suffered two gunshots to her abdomen, one gunshot to her right thigh and one gunshot to her left upper leg. Mr. Panella testified that the cause of Ms. Watts' death was the gunshot wounds and the manner of her death was homicide.

Mr. Panella also testified that Mr. Palm suffered four gunshot wounds to his right lower belly. The wounds struck his heart and aorta and he was dead within minutes. He also suffered two gunshot wounds to his right chest cavity and a gunshot wound to his right forearm. Mr. Panella also noticed a scalp injury resulting from blunt force trauma which he believed was consistent with being pistol whipped. Mr. Panella testified that the cause of death was the gunshot wounds and manner of death was homicide.

Brandon Palm, the son of victim[ ] Dahl Palm, testified that his father was the president of the West End Chapter of the Brother of the Hammer Motorcy[c]le Club. [Jones] was the Vice–President of the Chapter. Brandon Palm testified about an encounter between Ms. Watts and [Jones]. He testified that on May 31, 2008 he was at his father's garage with his father, Ms. Watts and some other people. At one point, [Jones] showed up at the garage. [Jones] approached Ms. Watts and she expressed to him that she didn't want to speak to him. She began walking away from him. [Jones] grabbed the back of her head and began punching her in the face. Mr. Palm intervened and stopped the assault. [Jones] got on his motorcycle and drove away. Ms. Watts then went to the hospital for treatment.

Marquita Harris testified that she was the sister of Ms. Watts. She testified that Ms. Watts began dating [Jones] in 2007 and that Ms. Watts broke off the relationship sometime in March or April of 2008. She testified that Ms. Watts then began dating Mr. Palm. She testified that she was aware of the assault committed by [Jones] on May 31, 2008. On the night of the assault, she met her sister at the hospital. After Ms. Watts was discharged, Ms. Harris accompanied her sister to the police station to file a report. She then accompanied Ms. Watts to obtain a Protection From Abuse order ("PFA") against [Jones]. She became aware at some point that Ms. Watts did not proceed with the final PFA order due to an agreement between Ms. Watts and [Jones] which involved the fact that Mr. Palm was facing assault charges for assaulting [Jones]. [Jones] and Ms. Watts agreed that Ms. Watts would terminate the PFA proceedings and [Jones] would drop the assault charges against Mr. Palm.

Ms. Harris testified that she was with Ms. Watts a couple of days after [Jones] assaulted [Ms.] Watts. While they were together, Ms. Watts received a text message from [Jones] in which [Jones] threatened to shoot Mr. Palm and Ms. Watts and then to put a bullet in his own head. Ms. Harris and Ms. Watts went to the police station to report the text message.

2

Jordan Palm, another of Dahl Palm's sons, testified that he was present when [Jones] assaulted Ms. Watts at his father's garage. His testimony was consistent with the testimony of his brother. He testified that shortly after this incident, he was sitting with his father at the garage when his father received a phone call from [Jones]. His father put the call on the phone's loud speaker and Jordan Palm heard [Jones] tell Mr. Palm that he "was not just going to ride off into the sunset." [Jones] specifically threatened to kill Mr. Palm, Ms. Watts and himself.

City of Pittsburgh Police Officer Deborah Stiokis testified that she was the officer who received the complaint made by Ms. Watts relative to the assault committed by [Jones] on May 31, 2008. Officer Stiokis advised Ms. Watts to obtain a PFA order and she provided her with an informational sheet indicating how such an order could be obtained. Officer Glenn Aldridge also testified that he was at the police station on May 31, 2008 and he interviewed both Ms. Watts and Mr. Palm. After the interviews, he intended to obtain an arrest warrant for [Jones]. Before he could obtain the warrant, Ms. Watts and Mr. Palm were murdered.

Curtis Tina Lockhart–Palm testified that she was the wife of Mr. Palm. She and Mr. Palm were separated. She testified that in June, 2008, [Jones] telephoned her to discuss the relationship between Ms. Watts and Mr. Palm. [Jones] appeared at Ms. Lockhart–Palm's place of employment and Mr. Palm appeared a short time later. An altercation ensued between [Jones] and Mr. Palm. Police Officer Donald Mitchell testified that he responded to the incident described by Curtis Tina Lockhart–Palm. He testified that [Jones] appeared to have received a broken jaw during the incident. He intended to arrest Mr. Palm but he was murdered before Officer Mitchell could arrest him.

Channing Buefort testified that he was a member of the same motorcycle club as [Jones] and the victims. He testified that shortly before July 4, 2008, [Jones] called him and asked if he could get [Jones] a gun. Mr. Buefort was not able to fulfill the request but he referred him to another person, Warren Horton. Mr. Horton was a state constable. Mr. Horton testified that he received a telephone call from [Jones] about three weeks before the murders seeking to join the Pittsburgh Chapter of the Brother of the Hammer Motorcycle Club because he was having some difficulties at the West End Chapter due to the relationship between the victims in this case. Mr. Horton testified that [Jones] asked to purchase a gun from him. Mr. Horton offered to sell him a .38 caliber handgun for $350. Mr. Horton told [Jones] that the sale had to be legal with all necessary paperwork. After [Jones] heard these requirements, he asked Mr. Horton if he knew anyone else from whom he could purchase a gun.

Detective Terry Rediger from the Allegheny County Police Department testified about the crime scene. He testified that Ms. Watts was found lying on her back on the floor between the bed and a wall in the master bedroom and Mr. Palm was found lying on his back on the floor next to the other side of the bed. There was no sign of forced entry into the apartment. Spent .40 caliber bullet casings were

3

found throughout the bedroom. Bullet holes were found in the floor of the bedroom and these holes corresponded to holes found in the ceiling of the basement.

Aaron Adams testified that Ms. Watts was his mother. He testified that he lived at his mother's residence at 1096 Valley Street. He testified that [Jones] had a key to the residence. He testified that at the time of the murder[s], he was living at the residence along with Amber Durrett and her daughter Tijha, who were friends of Ms. Watts. He testified that he left the residence at approximately 1:30–2:00 a.m. on the date of the murder[s] to spend the night with a lady friend. He explained that the doors were locked when he left.

Regina Heckert testified that she lived at 705 Russellwood Avenue in McKees Rocks, Pennsylvania. Ms. Watts' apartment building was next to her backyard. Sometime around 4:00 a.m., she heard gunshots. She heard a series of gunshots, then a pause, then more gunshots. She looked out her window. There were streetlights that illuminated the area around the apartment. She observed a person walking up Blumling Way, an alley next to the apartment. She noticed that the person was black. He was wearing a light colored short-sleeved shirt and was wearing dark shorts. She believed the shorts to be denim shorts. His hair was cropped, not long and not short. She described the person as being of medium height and stocky. She admitted that she did not see the face of the person but that it could have been [Jones]. After the person disappeared, she heard a woman scream. Soon thereafter, police arrived on scene.

Amber Durrett testified that she was in the apartment on the night of the murders. She was sleeping in an adjacent room with her daughter when she was awaken[e]d by the gunshots. She grabbed her young daughter and retreated to a back room. She heard some shots then she heard Ms. Watts screaming "no, no, stop!" After the shooting stopped, she heard the kitchen door slam shut. She went into the master bedroom, which was filled with smoke. She saw Mr. Palm lying on the floor riddled with gunshots and bleeding. She fled the house with her daughter and got into her car. She drove around the corner and called the police. She had not seen Ms. Watts in the bedroom and initially feared that Ms. Watts shot Mr. Palm. She relayed her concerns to the police.

Leo Thomas testified in this case. He testified that on July 4, 2008, he noticed a car parked in front of his residence. This was unusual to him because cars were not often parked in that area. The car was [Jones'] vehicle. He observed the car at approximately 4:00 a.m. In the early morning hours, he received a call from [Jones'] brother indicating that [Jones] may be a suspect in a homicide. Later that day, he interacted with [Jones'] family and was asked to drive [Jones] to downtown Pittsburgh so [Jones] could turn himself in to police. When Mr. Thomas picked [Jones] up, [Jones] had a blank look on his face and appeared mentally "disheveled". On the ride to the police station, Mr. Thomas asked [Jones] if he was okay. [Jones] responded by saying "I'm okay now. They got what they deserved." According to Mr. Thomas, [Jones] had an arrogant and boastful demeanor when he made those comments.

4

Detective Timothy Lanigan testified that he obtained samples from [Jones] to perform gunshot residue testing of [his] skin and clothing. He encountered [Jones] around 11:00 a.m. on the day of the murders. Detective Lanigan testified that [Jones] was wearing a dark blue pullover style shirt, a light-colored yellow t-shirt, denim shorts and white tennis shoes. Swabs of [Jones'] hands were obtained as well as samples from his clothing. These swabs were submitted for gunshot residue testing. Detective Lanigan also testified that [Jones] was arrested in May of 2010 and at that time [Jones] was approximately 5'8" and weighed approximately 185 lbs. According to Detective Lanigan, [Jones] was heavier on the date of the murder[s] than he was when he got arrested.

Robert Levine testified that he was employed by the Allegheny County Medical Examiner's Office and that among his duties are performing gunshot residue tests and ballistics examinations. He performed the gunshot residue testing on the sample taken from [Jones] on July 4, 2008. Gunshot residue was found on [Jones'] left palm. He also testified that all of the bullets fired from the shell casings found at the murder scene were fired from the same weapon.

Detective Scott Towne testified that he investigated whether [Jones] has a license to carry a firearm on the date of the murders. He testified that [Jones] did not have the appropriate license. Detective Towne also testified concerning cell phone records relating to [Jone's] cell phone. Cell phone records indicated that [Jones] made calls from his cell phone at 3:53 a.m. He made another call at 3:59 and 4:10 a.m. The murders occurred at 4:35 a.m. on July 4, 2008. Various other calls were made to [Jones] by his daughter, Jaunel Jones between 5:00 a.m. and 6:00 a.m.

Elona Somple testified that she worked for the R.J. Lee Company. This company is in the business of testing evidence for the presence of gunshot residue. She testified that she tested [Jone's] blue pullover, yellow t-shirt and denim shorts for the presence of gunshot residue. Ms. Somple testified that she received the clothing on July 30, 2008. The items were tested on August 7, 2008. All three elements of gunshot residue, antimony, barium and lead, w[ere] present on the denim shorts. Two of these elements were found on the yellow t-shirt and on the inside of the blue pullover [Jones] was wearing on July 4, 2008.

[Jones] presented a number of witnesses in his case-in-chief. Jessica Pluechel testified that she was with [Jones] on July 3, 2008 and it was hot. She testified that she was taking care of him due to his broken jaw. She recalled him being pleasant on that day.

Juanel Jones testified for the defense. She is [Jones'] daughter. She testified that [s]he called [Jones] multiple times in the early morning hours of July 4, 2008 because she was afraid that the father of her baby was harassing her. She never spoke to [Jones] but she left him messages. At approximately 6:30 a.m., [Jones] came to her residence to stay with her. She was awakened later that morning by her brother who had called her to tell her that the police were looking for [Jones]. She

5

> looked for [Jones] in her residence but found that he was no longer there. On cross-examination, Ms. Jones was confronted with her grand jury testimony during which she denied calling [Jones] or seeing him in the early morning hours of July 4, 2008. She repeatedly testified that she couldn't recall her grand jury testimony.
>
> Wendell Jones, Sr. testified that he was [Jones'] father. He testified that he, not Leo Thomas, drove [Jones] to turn himself in on July 4, 2008.
>
> [Jones] testified at trial. He denied murdering the victims and he testified that a number of the Commonwealth witnesses were not telling the truth. He also testified that he was home alone at the time of the murder[s].

(Resp's Ex. 48 at 445-53.)

The trial court sentenced Jones in October 2011 to two life sentences (one for each first degree murder conviction) as well as a term of 10-20 years' incarceration for the burglary conviction.

Jones, through new counsel, filed a direct appeal with the Superior Court of Pennsylvania in which he raised claims not relevant to this federal habeas case. (*See* ECF 17 at 6 (summarizing the claims Jones raised on direct appeal.)) The Superior Court of Pennsylvania affirmed Jones' judgment of sentence in *Commonwealth v. Jones*, 1870 WDA 2012, 2014 WL 10919379 (Pa. Super. Ct. June 6, 2014) ("*Jones I*"). The Supreme Court of Pennsylvania denied a petition for allowance of appeal on December 26, 2014. (Resp's Ex. 32.)

Jones did not file a petition for a writ of certiorari with the Supreme Court of the United States. Thus, his judgment of sentence became final under both state and federal law on or around March 26, 2015, when the 90-day period for him to do so expired. 42 Pa. Cons. Stat. § 9545(b)(3); 28 U.S.C. § 2244(d)(1)(A). *Gonzalez v. Thaler*, 565 U.S. 134, 149-50 (2012) (a judgment becomes final at the conclusion of direct review or the expiration of time for seeking such review).

On December 22, 2015, Jones filed a counseled petition for collateral relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541 et seq. (Resp's Ex. 33.) Following a hearing, the PCRA court denied Jones' claims. (Resp's Ex. 44.) In Jones'

subsequent appeal to the Superior Court, he claimed that the PCRA court erred in denying these claims:

1. Whether trial counsel was ineffective for failing to request a jury instruction on alibi and failing to object to the court's failure to provide such an instruction in its final charge to the jury?

2. Whether trial counsel was ineffective for failing to request a jury instruction on the third-party culpability defense and failing to object to the court's charge omitting same?

3. Whether trial counsel was ineffective for failing to request a specific jury instruction on Jones' prior consistent statement to police that he was at his home when the murders were committed and that he did not commit the crimes?

The Superior Court affirmed the PCRA court's order in *Commonwealth v. Jones*, 1781 WDA 216, 2017 WL 6461845 (Pa. Super. Ct. Dec. 16, 2017) ("*Jones II*"). It denied each of Jones' claims on the merits.

The Supreme Court of Pennsylvania granted Jones a petition for allowance of appeal with respect to the first claim listed above. On July 17, 2019, the Supreme Court denied that claim on the merits in *Commonwealth v. Jones*, 210 A.3d 1014 (Pa. 2019) ("*Jones III*").

Jones filed his Petition for a Writ of Habeas Corpus with this Court, at the very earliest, on October 21, 2020, which is the date he claims he placed it in the prison mailing system. (ECF 1 at 15.) He brings one or more of the same claims of trial counsel's ineffectiveness that he raised in the PCRA proceeding. (*Id.* at 5-7.)[3]

---

[3] Jones claims the Supreme Court of Pennsylvania erred when it denied one or more of the claims he raised during the first PCRA proceeding. The only cognizable federal habeas claims are the underlying claims of trial counsel's alleged ineffectiveness. *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) (the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding is not cognizable); *Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004) ("[A]lleged errors in collateral proceedings are not a *Footnote continue on next page…*

Around this same time, Jones filed a second, pro se, PCRA petition raising new claims of trial counsel's ineffectiveness. (Resp's Ex. 58.) This Court stayed this federal habeas case while Jones' litigated that collateral proceeding in state court. (ECF 11.)

The PCRA court appointed new counsel to represent Jones. (Resp's Ex. 59.) That counsel subsequently filed an application for leave to withdraw and an accompanying "no-merit" letter pursuant to *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. 1988) (en banc). On June 15, 2022, the PCRA court denied the second PCRA petition because it was untimely filed under the applicable state-law limitations period, which is codified at 42 Pa. Cons. Stat. § 9545(b) and which is jurisdictional.

This Court then lifted the stay in this case and Respondents filed the Answer (ECF 17) to the Petition. Respondents assert that the Court should deny Jones' claims because they are time-barred under the applicable one-year statute of limitations, which is set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and codified at 28 U.S.C. § 2244(d). Jones' reply was due on May 10, 2023. (ECF 18.) He did not file one. However, in the Petition Jones acknowledges that his claims are untimely and asserts grounds for equitable tolling, which the Court will address below. (ECF 1 at 13-14.)

## II.  Discussion

### A.  Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state-court judgment. It permits a federal court to grant a state prisoner a writ of habeas corpus "on the ground that he or she is in custody in violation of the

---

proper basis for habeas relief from the original conviction.") Thus, the Court gives Jones the benefit of the doubt and assumes he is raising one or more of the claims he raised in his first PCRA proceeding.

Constitution…of the United States." 28 U.S.C. § 2254(a). Errors of state law are not cognizable. *Id.*; *see, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is Jones' burden to prove that he is entitled to the writ. *See, e.g.*, *Vickers v. Sup't Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017).

In 1996, Congress made significant amendments to the federal habeas statutes with the enactment of AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (internal quotations and citation omitted).

AEDPA substantially revised the law governing federal habeas corpus. Among other things, AEDPA set a one-year limitations period for filing a federal habeas petition. *See Pace v. DiGuglielmo*, 544 U.S. 408, 410 (2005).

B. Jones' Claims are Time-barred

AEDPA's statute of limitations is codified at 28 U.S.C. § 2244(d) and it requires, with a few exceptions not applicable here, that habeas corpus claims under 28 U.S.C. § 2254 be filed within one year of the date the petitioner's judgment of sentence became final. 28 U.S.C. § 2244(d)(1)(A).[4] AEDPA also provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim

---

[4] The date upon which AEDPA's one-year limitations period commenced is determined on a claim-by-claim basis. *Fielder v. Varner*, 379 F.3d 113, 118-22 (3d Cir. 2004). In this case, the statute of limitations for each of Jones' claims began to run on the date his judgment of sentence became final in accordance with § 2244(d)(1)(A). The remaining provisions of § 2244(d)(1) do not apply to any of Jones' claims. 28 U.S.C. § 2244(d)(1)(B)-(D).

is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

As explained above, Jones' judgment of sentence became final on March 26, 2015. He filed the first counseled PCRA petition approximately 270 days later, on December 22, 2015. Under § 2244(d)(2), this PCRA proceeding statutorily tolled AEDPA's limitations period beginning on December 22, 2015. The PCRA proceeding remained pending through July 17, 2019, which is the date the Supreme Court of Pennsylvania issued *Jones III*, thereby concluding Jones' first PCRA proceeding. *Lawrence v. Florida*, 549 U.S. 327, 331-36 (2007) (a petitioner is not entitled to statutory tolling for the period available to petition for writ of certiorari to the United States Supreme Court following state collateral review); *Swartz v. Meyers*, 204 F.3d 417, 419-20 (3d Cir. 2000) (same).[5]

AEDPA's limitations period began to run again the next day, on July 18, 2019. Because 270 days had expired already from the limitations period, Jones had 95 more days—until on or around October 21, 2019—to file a timely federal habeas petition. He did not file his Petition until October 21, 2020, thereby making the claims he raised in the Petition untimely by one year.

The Supreme Court has held that AEDPA's limitations period "is subject to equitable tolling in appropriate cases."[6] *Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner is entitled

---

[5] As for the second PCRA petition Jones filed pro se in October 2020, it was filed after AEDPA's statute of limitations expired, so it could not serve to statutorily toll the limitations period. Moreover, because it was deemed to be untimely under state law, it could not statutorily toll AEDPA's statute of limitations for this separate reason as well. *Pace*, 544 U.S. at 417 (a state postconviction petition that is "rejected ... as untimely ... was not 'properly filed' ... and ... [does] not entitle[ ] a federal habeas corpus [petitioner] to statutory tolling under § 2244(d)(2).").

[6] Another exception to AEDPA's statute of limitations is the "miscarriage of justice" exception. In *McQuiggin v. Perkins*, 569 U.S. 383 (2013), the Supreme Court recognized that the actual-innocence "gateway" to federal habeas review developed in *Schlup v. Delo*, 513 U.S. 298 (1995) for procedurally defaulted claims extends to cases in which a petitioner's claims would otherwise *Footnote continue on next page…*

to equitable tolling only if he shows both that: (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing. *Id.* at 649. Jones contends that he erroneously thought he had more time to file timely federal habeas petition, but a petitioner's "lack of legal knowledge or legal training does not alone justify equitable tolling." *Ross v. Varano*, 712 F.3d 784, 799-800 (3d Cir. 2013) (citing *Brown v. Shannon*, 322 F.3d 768, 774 (3d Cir. 2003)) (equitable tolling not justified where petitioner had one month left in limitations period in which he could have filed "at least a basic pro se habeas petition" at the time that petitioner's attorney informed him that he would not file an appeal in state court on his behalf and could no longer adequately represent him); and *Doe v. Menefee*, 391 F.3d 147, 177 (2d Cir. 2004) ("Given that we expect pro se petitioners to know when the limitations period expires ..such inadvertence on Doe's part cannot constitute reasonable diligence.")

Jones also asserts that he is entitled to equitable tolling because the prison at which he is housed went on lockdown due to COVID-19 on March 31, 2020. As a result, Jones claims, he had limited access to the law library. As Respondents point out, assuming that is true, it does not assist Jones because, as set forth above, AEDPA's limitations period had expired on October 21, 2019, well before the lockdown.

Based on the above, each of Jones' federal habeas claims are time-barred. For this reason, the Court will deny the Petition with prejudice.

---

be barred by the expiration AEDPA's one-year statute of limitations. This exception provides that a petitioner's failure to comply with AEDPA's one-year limitations period may be excused if the petitioner presents evidence of "actual innocence" that is "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error[.]" *Schlup*, 513 U.S. at 316. The "miscarriage of justice" exception only applies in extraordinary cases in which the petitioner shows that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Schlup*, 513 U.S. at 316. This is not one of the rare cases in which the miscarriage of justice rule is implicated.

**III.    Certificate of Appealability**

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue…only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying that standard here, jurists of reason would not find it debatable whether Jones' claims should be denied as untimely. Thus, a certificate of appealability is denied with respect to each claim.

**IV.    Conclusion**

The Court will deny the Petition with prejudice because all claims asserted in it are time-barred and will deny a certificate of appealability with respect to each claim.

An appropriate Order follows.

Date:  September 1, 2023                                    /s/ Patricia L. Dodge
                                                            PATRICIA L. DODGE
                                                            United States Magistrate Judge